# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Department of Justice<br>Antitrust Division<br>450 Fifth Street, N.W. Suite 4000<br>Washington, D.C. 20530<br><br>*Plaintiff,*<br><br>v.<br><br>MEDIA GENERAL, INC.,<br>333 E. Franklin Street<br>Richmond, VA 23219<br><br>and<br><br>LIN MEDIA LLC,<br>701 Brazos Street<br>Suite 800<br>Austin, TX 78701<br><br>*Defendants.* | CASE NO.<br><br>JUDGE:<br><br>FILED: |

## COMPLAINT

The United States of America, acting under the direction of the Attorney General of the United States brings this civil action to enjoin the proposed acquisition by Media General, Inc. ("Media General") of LIN Media LLC ("LIN") (collectively, "Defendants") and to obtain other equitable relief. The proposed acquisition likely would substantially lessen competition in the sale of broadcast television spot advertising in the following Designated Market Areas ("DMAs"): Mobile, Alabama/Pensacola, Florida; Birmingham, Alabama; Savannah, Georgia; Providence, Rhode Island/New Bedford, Massachusetts; and Green Bay/Appleton, Wisconsin

(collectively "the DMA Markets"), in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. Plaintiff alleges as follows:

## I. NATURE OF THE ACTION

1. Pursuant to a Purchase Agreement dated March 21, 2014, Media General agreed to purchase LIN whereby LIN shareholders would receive aggregate consideration valued at approximately $1.5 billion in a combination of stock and cash.

2. Media General and LIN both own and operate broadcast television stations in each of the DMA Markets. Media General's and LIN's broadcast television stations compete head-to-head for the business of local and national companies that advertise on broadcast television stations in each of the DMA Markets.

3. If consummated, the proposed acquisition would eliminate the head-to-head competition between Media General and LIN in each of the DMA Markets. Unless enjoined, the acquisition is likely to lead to higher prices and will substantially lessen competition for broadcast television spot advertising in each of the DMA Markets in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

## II. JURISDICTION AND VENUE

4. The United States brings this action pursuant to Section 15 of the Clayton Act, as amended, 15 U.S.C. § 25, to prevent and restrain Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.

5. Defendants sell broadcast television spot advertising, a commercial activity that substantially affects, and is in the flow of, interstate commerce. The Court has subject-matter jurisdiction over this action pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 25, and 28 U.S.C. §§ 1331, 1337(a), and 1345.

6.      Defendants transact business and are found in the District of Columbia, and are subject to the personal jurisdiction of this Court.  Defendants have consented to venue and personal jurisdiction in this District.  Therefore, venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(c).

### III. THE DEFENDANTS

7.      Media General is incorporated in the Commonwealth of Virginia, with its headquarters in Richmond, Virginia.  Media General reported operating revenues of over $270 million in 2013.  Media General owns and operates 31 broadcast television stations in 29 metropolitan areas.  It owns and operates broadcast television stations in each of the DMA Markets.

8.      LIN is a Delaware corporation, with its headquarters in Austin, Texas.  LIN owns and operates, or provides programming, operating, or sales services to more than 50 stations in 23 metropolitan areas.  It also owns and operates, or provides programming, operating, or sales services to broadcast television stations in each of the DMA Markets.

### IV. TRADE AND COMMERCE

**A.      Broadcast Television Spot Advertising is a Relevant Product Market**

9.      Broadcast television stations attract viewers through their programming, which is delivered for free over the air or retransmitted to viewers, mainly through wired cable or other terrestrial television systems and through satellite television systems.  Broadcast television stations then sell advertising time to businesses that want to advertise their products to television viewers.  Broadcast television "spot" advertising, which comprises the majority of a television station's revenues, is sold directly by the station itself or through its national representative on a localized basis and is purchased by advertisers who want to target potential customers in specific geographic areas. Spot advertising differs from network and syndicated television advertising,

which are sold by television networks and producers of syndicated programs on a nationwide basis and broadcast in every market where the network or syndicated program is aired.

10. Broadcast television spot advertising possesses a unique combination of attributes that set it apart from advertising using other types of media. Television combines sight, sound, and motion, thereby creating a more memorable advertisement. Moreover, of all media, broadcast television spot advertising generally reaches the largest percentage of all potential customers in a particular target geographic area and is therefore especially effective in introducing, establishing, and maintaining the image of a product. For a significant number of advertisers, broadcast television spot advertising, because of its unique combination of attributes, is an advertising medium for which there is no close substitute. Other media, such as radio, newspapers, or outdoor billboards, are not desirable substitutes for broadcast television advertising. None of these media can provide the important combination of sight, sound, and motion that makes television unique and impactful as a medium for advertising.

11. Like broadcast television, subscription television channels, such as those carried over cable or satellite television, combine elements of sight, sound, and motion, but they are not a desirable substitute for broadcast television spot advertising for two important reasons. First, satellite, cable, and other subscription content delivery systems do not have the "reach" of broadcast television. Typically, broadcast television can reach well-over 90% of homes in a DMA, while cable television often reaches many fewer homes. Even when several subscription television companies within a DMA jointly offer cable television spot advertising through a consortium called an interconnect, cable spot advertising does not match the reach of broadcast television spot advertising. As a result, an advertiser can achieve greater audience penetration through broadcast television spot advertising than through advertising on a subscription television channel. Second, because subscription services may offer more than 100 channels,

4

they fragment the audience into small demographic segments. Because broadcast television programming typically has higher rating points than subscription television programming, broadcast television provides a much easier and more efficient means for an advertiser to reach a high proportion of its target demographic. Media buyers often buy time on subscription television channels not so much as a substitute for broadcast television, but rather to supplement a broadcast television message, to reach a narrow demographic (e.g., 18–24 year olds) with greater frequency, or to target narrow geographic areas within a DMA. A small but significant price increase by broadcast television spot advertising providers would not be made unprofitable by advertisers switching to advertising on subscription television channels.

12. Internet-based media is not currently a substitute for broadcast television spot advertising. Although Online Video Distributors ("OVDs") such as Netflix and Hulu are important sources of video programming, as with cable television advertising, the local video advertising of OVDs lacks the reach of broadcast television spot advertising. Non-video internet advertising, e.g., website banner advertising, lacks the important combination of sight, sound, and motion that gives television its impact. Consequently, local media buyers currently purchase internet-based advertising primarily as a supplement to broadcast television spot advertising, and a small but significant price increase by broadcast television spot advertising providers would not be made unprofitable by advertisers switching to internet-based advertising.

13. Broadcast television stations generally can identify advertisers with strong preferences for using broadcast television advertising. Broadcast television stations negotiate prices individually with advertisers and consequently can charge different advertisers different prices. During the individualized negotiations on price and available advertising slots that commonly occur between advertisers and broadcast television stations, advertisers provide stations with information about their advertising needs, including their target audience.

5

Broadcast television stations could profitably raise prices to those advertisers who view broadcast television as a necessary advertising medium, either as their sole means of advertising or as a necessary part of a total advertising plan.

14.     Accordingly, the sale of broadcast television spot advertising is a line of commerce under Section 7 of the Clayton Act and a relevant product market for purposes of analyzing the proposed acquisition under Section 7 of the Clayton Act.

### B.     Each of the Divestiture Markets is a Relevant Geographic Market

15.     DMAs are geographic units defined by the A.C. Nielsen Company, a firm that surveys television viewers and furnishes broadcast television stations, advertisers, and advertising agencies in a particular area with data to aid in evaluating audience size and composition.  DMAs are ranked according to the number of households they contain.  Signals from broadcast television stations located in a DMA Market reach viewers located throughout the DMA, but signals from broadcast television stations located outside the DMA reach few viewers within the DMA.  DMAs are used to analyze revenues and shares of broadcast television stations in the *Investing in Television BIA Market Report 2014* (1st edition), a standard industry reference.

16.     Advertisers use broadcast television stations within each of the DMA Markets to reach the largest possible number of viewers across the DMA.  Some of these advertisers are located in each of the DMA Markets and need to reach customers there; others are regional or national businesses that want to target consumers across each of the DMA Markets.  Advertising on television stations outside each of the DMA Markets is not an alternative for these advertisers because such stations cannot be viewed by a significant number of potential customers within each of the DMAs.  Thus, if there were a small but significant increase in broadcast television spot advertising prices within a specific DMA Market, an insufficient number of advertisers

would switch advertising purchases to television stations outside that DMA to render the price increase unprofitable.

17. Accordingly, each of the DMA Markets is a section of the country under Section 7 of the Clayton Act and a relevant geographic market for the sale of broadcast television spot advertising for purposes of analyzing the proposed acquisition under Section 7 of the Clayton Act.

### C.   The Proposed Acquisition would Harm Competition in Each of the DMA Markets

18. Broadcast television stations compete for advertisers through programming that attracts viewers to their stations. In developing their own programming and in considering the programming of the networks with which they may be affiliated, broadcast television stations try to select programs that appeal to the greatest number of viewers and to differentiate their stations from others in the same DMA by appealing to specific demographic groups. Advertisers, in turn, are interested in using broadcast television spot advertising to reach both a large audience and a high proportion of the type of viewers that are most likely to buy their products.

19. Broadcast station ownership in each of the DMA Markets is already significantly concentrated. In each of these markets, four stations, each affiliated with a major network, had more than 90 percent of gross advertising revenues in 2013. In the Mobile, Alabama/Pensacola, Florida DMA, the three stations that Media General and LIN operate have approximately 54 percent of all television station gross advertising revenues in that DMA. In the Birmingham, Alabama DMA, the two stations that Media General and LIN operate have approximately 34 percent of all television station gross advertising revenues in that DMA. In the Savannah, Georgia DMA, the three stations that Media General and LIN operate have approximately 55 percent of all television station gross advertising revenues in that DMA. In the Providence,

Rhode Island/New Bedford, Massachusetts DMA, the three stations that Media General and LIN operate have approximately 83 percent of all television station gross advertising revenues in that DMA.  In the Green Bay/Appleton, Wisconsin DMA, the three stations that Media General and LIN operate have approximately 59 percent of all television station gross advertising revenues in that DMA.

20. Using the Herfindahl-Hirschman Index ("HHI"), a standard measure of market concentration (defined and explained in Appendix A), a combination of Media General's and LIN's broadcast television stations in each of the DMA markets would result in both a large change in concentration and a highly concentrated market.  The post-acquisition HHI in each of the DMA Markets would be over 2500 with an increase in the HHI of more than 500 points.  Under the Horizontal Merger Guidelines issued by the Department of Justice and the Federal Trade Commission, mergers resulting in highly concentrated markets (with an HHI in excess of 2500) and with an increase in the HHI of more than 200 points are presumed to be likely to enhance market power.

21. In addition to increasing concentration in the DMA Markets, the proposed transaction combines stations that are close substitutes and vigorous competitors in markets with limited alternatives.  In each of the DMA Markets, Defendants have broadcast stations that are affiliated with the major national television networks, ABC, CBS, NBC, and FOX.  Their respective affiliations with those networks, and their local news operations, provide Defendants' stations with a variety of competing programming options that are often each other's next-best or second-best substitutes for many viewers and advertisers.

22. Advertisers benefit from Defendants' head-to-head competition in the sale of broadcast television spot advertising in each of the DMA Markets.  Advertisers purposefully spread their advertising dollars across numerous spot advertising suppliers to reach their

marketing goals most efficiently. After the proposed acquisition, advertisers in each of the DMA Markets would likely find it more difficult to "buy around" the Defendants' combined stations in response to higher advertising rates, than to "buy around" Media General's stations or LIN's stations, as separate entities, as they could have done before the proposed acquisition. Because a significant number of advertisers would likely be unable to reach their desired audiences as effectively unless they advertise on at least one station that Media General would control after the proposed acquisition, those advertisers' bargaining positions would be weaker, and the advertising rates they pay would likely increase.

23. Accordingly, the proposed acquisition is likely to substantially reduce competition and will restrain trade in the sale of broadcast television spot advertising in each of the DMA Markets.

**D.     Lack of Countervailing Factors**

**1.     Entry and Expansion Are Unlikely**

24. De novo entry into each of the DMA Markets is unlikely. The FCC regulates entry through the issuance of broadcast television licenses, which are difficult to obtain because the availability of spectrum is limited and the regulatory process associated with obtaining a license is lengthy. Even if a new signal became available, commercial success would come, at best, over a period of many years. In each of the DMA Markets, all of the major broadcast networks (CBS, NBC, ABC, FOX) are already affiliated with a licensee, the contracts last for many years, and the broadcast networks rarely switch licensees when the contracts expire. Thus, entry into each DMA Market's broadcast television spot advertising market would not be timely, likely, or sufficient to deter Media General from engaging in anticompetitive price increases or other anticompetitive conduct after the proposed acquisition occurs.

25. Other broadcast television stations in each of the DMA Markets could not readily increase their advertising capacity or change their programming sufficiently in response to a price increase by Defendants. The number of 30-second spots in a DMA is largely fixed by programming and time constraints. This fact makes the pricing of spots very responsive to changes in demand. During so-called political years, for example, political advertisements crowd out commercial advertising and make the spots available for commercial advertisers more expensive than they would be in nonpolitical years. Adjusting programming in response to a pricing change is risky, difficult, and time-consuming. Network affiliates are often committed to the programming provided by the network with which they are affiliated, and it often takes years for a station to build its audience. Programming schedules are complex and carefully constructed, taking many factors into account, such as audience flow, station identity, and program popularity. In addition, stations typically have multi-year contractual commitments for individual shows. Accordingly, a television station is unlikely to change its programming sufficiently or with sufficient rapidity to overcome a small but significant price increase imposed by Defendants.

### 2. The Alleged Efficiencies Do Not Offset the Harm

26. Although Defendants assert that the proposed acquisition would produce efficiencies, they cannot demonstrate acquisition-specific and cognizable efficiencies that would be sufficient to offset the proposed acquisition's anticompetitive effects.

### V. VIOLATIONS ALLEGED

27. Plaintiff hereby repeats and realleges the allegations of paragraphs 1 through 26 as if fully set forth herein.

28. The proposed acquisition likely would lessen competition substantially in interstate trade and commerce, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. The proposed acquisition likely would have the following effects, among others:

   a. competition in the sale of broadcast television spot advertising in each of the DMA Markets would be lessened substantially;

   b. competition among Media General and LIN in the sale of broadcast television spot advertising in each of the DMA Markets would be eliminated; and

   c. the prices for spot advertising time on broadcast television stations in each of the DMA Markets would likely increase.

29. Unless restrained, the proposed acquisition would violate Section 7 of the Clayton Act, 15 U.S.C. § 18.

## VI. REQUEST FOR RELIEF

30. Plaintiff requests:

   a. that the Court adjudge the proposed merger to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

   b. that the Court permanently enjoin and restrain Defendants from carrying out the transaction, or entering into any other agreement, understanding, or plan by which Media General would acquire LIN, unless Defendants divest the broadcast television stations in accordance with the proposed Final Judgment and Hold Separate Stipulation and Order filed concurrently with this Complaint;

   c. that the proposed Final Judgment giving effect to the divestitures be entered by the Court after compliance with the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16;

   d. that the Court award Plaintiff the costs of this action; and

   e. that the Court award such other relief to Plaintiff as the Court may deem just and proper.

Respectfully submitted,

FOR PLAINTIFF UNITED STATES:

*[signature]*
William J. Baer (D.C. Bar #324723)
Assistant Attorney General

*[signature]*
David I. Gelfand (D.C. Bar #416596)
Deputy Assistant Attorney General

*[signature]*
Patricia A. Brink
Director of Civil Enforcement

*[signature]*
David C. Kully
Chief, Litigation III Section

*[signature]*
Mark A. Merva* (D.C. Bar #451743)
Anupama Sawkar
Trial Attorneys

United States Department of Justice
Antitrust Division
Litigation III Section
450 Fifth Street, N.W., Suite 4000
Washington, D.C. 20530
Phone: 202-616-1398
Facsimile: 202-514-7308
Email: Mark.Merva@usdoj.gov

*Attorney of Record

Dated:  October 30, 2014

APPENDIX A

## Herfindahl-Hirschman Index

The term "HHI" means the Herfindahl-Hirschman Index, a commonly accepted measure of market concentration. The HHI is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers. For example, for a market consisting of four firms with shares of 30, 30, 20, and 20 percent, the HHI is 2,600 ($30^2 + 30^2 + 20^2 + 20^2 = 2,600$). The HHI takes into account the relative size distribution of the firms in a market. It approaches zero when a market is occupied by a large number of firms of relatively equal size and reaches its maximum of 10,000 points when a market is controlled by a single firm. The HHI increases both as the number of firms in the market decreases and as the disparity in size between those firms increases. Markets in which the HHI is between 1,500 and 2,500 points are considered to be moderately concentrated, and markets in which the HHI is in excess of 2,500 points are considered to be highly concentrated. *See* U.S. Department of Justice & FTC, *Horizontal Merger Guidelines* § 5.3 (2010). Transactions that increase the HHI by more than 200 points in highly concentrated markets presumptively raise antitrust concerns under the *Horizontal Merger Guidelines* issued by the Department of Justice and the Federal Trade Commission. *See id.*